**UNDER SEAL**

# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF VIRGINIA

## Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) UNDER SEAL |
| v. | ) |
| | ) |
| TODD ELLIOTT HITT, | ) Case No. 1:18-MJ-480 |
| | ) |
| | ) |
| Defendant | ) |

FILED OCT - 4 2018 CLERK, U.S. DISTRICT COURT ALEXANDRIA, VIRGINIA

**AFFIDAVIT IN SUPPORT OF APPLICATION FOR
CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Jeremy Desor, being duly sworn, depose and state as follows:

**INTRODUCTION**

1. I am a Special Agent of the Federal Bureau of Investigation, and I have been employed in that position for approximately 14 years. I am currently assigned to the FBI's Washington Field Office ("WFO"). As part of my assigned duties, I investigate possible violations of federal criminal law. During my career with the FBI, I have been assigned to squads that focus on the investigation of white collar crime in Chicago, San Francisco, and the WFO. During my career as an FBI agent, I have participated in more than 30 such white collar investigations, and I have been the lead or co-lead agent in more than 20 of those investigations. I have also worked in the Economic Crimes Unit at FBI headquarters with program management responsibilities relating to white collar programs.

2. This affidavit is made in support of an application for an arrest warrant and a criminal complaint charging TODD ELLIOTT HITT ("HITT") with violation of Title 15, United

States Code, Sections 78j(b) and 78ff; Title 17 Code of Federal Regulation, Section 240.10b-5 (Securities Fraud), in that HITT unlawfully, willfully, and knowingly, by the use of the means and instrumentalities of interstate commerce and the mails, directly and indirectly, did use and employ in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, HITT misrepresented to investors that HITT had invested $6 million as a general partner in the combined purchase of a commercial office building located in Herndon, Virginia. HITT further made material omissions to investors regarding HITT's personal use of investor moneys and the assets under management by his company.

3. The facts and information contained in this affidavit are based upon my personal knowledge and the investigation and observations of other officers and agents involved in the investigation. All observations referenced below that were not personally made by me were related to me by persons who made such observations. This affidavit also contains information obtained from multiple sources—including reports of witness interviews, information provided to me by other law enforcement agents and officers, documents and financial records as well as analysis provided by different entities and individuals, to include regulatory agencies such as the United States Securities and Exchange Commission ("SEC"), and publicly available information. This affidavit contains information necessary to support probable cause for this application. It is not intended to include each and every fact and matter observed by me or known to the government.

## RELEVANT INDIVIDUALS AND ENTITIES

4. TODD ELLIOTT HITT, a citizen of the United States and resident of the Eastern District of Virginia, was the founder of KIDDAR CAPITAL.

5. KIDDAR CAPITAL was a business located in the City of Falls Church, Virginia, which solicited funds for a variety of investment offerings associated typically with real estate or venture capital. At all times relevant to the allegations in this affidavit, HITT acted as the president or chief executive officer of KIDDAR CAPITAL and controlled all aspects of the business.

6. Employee A, Employee B, and Employee C previously worked for KIDDAR CAPITAL at its offices in the City of Falls Church, Virginia.

7. KIDDAR HERNDON STATION LLC ("KHS") was a limited liability company organized by HITT in the state of Virginia on July 3, 2017. The primary purpose of KHS was to accept investments for the purchase of an office building in Herndon, Virginia.

8. Investor A, an individual who resided in Arlington, Virginia at all relevant times, was an investor in KHS.

9. Investor B, an individual who resided in McLean, Virginia at all relevant times, was an investor in KHS.

10. Investor C, a business whose purpose was to develop Class A upper-end apartment communities, was an investor in KHS. Investor C operated in locations both within and outside of the Eastern District of Virginia.

11. Investor D, an offshore investment company, was an investor in KIDDAR CAPITAL. As detailed below HITT misrepresented to Investor D that the funds received by KIDDAR CAPITAL from Investor D would be used to invest in KHS.

## SUMMARY

12. In June 2018, the FBI was contacted by Employee A and Employee B regarding allegations that HITT was misappropriating and/or commingling investor funds obtained by KIDDAR CAPITAL, and that HITT was soliciting new investors utilizing documents that contained materially false statements.

13. The FBI subsequently opened a criminal investigation into possible securities fraud violations by HITT and KIDDAR CAPITAL. The SEC opened a formal parallel civil investigation at approximately the same time.

14. The KHS offering involved the purchase of a commercial building in Herndon, Virginia ("the Herndon building"), which was adjacent to a future stop on the Silver Line of the Washington, DC, Metro. The total purchase price was approximately $33 million.

15. KHS intended to be the sole owner of the Herndon building, and, as set forth in an offering memorandum, planned to finance the purchase with a $24 million bank loan, a $6 million contribution by the General Partner, and an additional $6 million from Limited Partners.

16. HITT represented to investors in KHS that he would contribute $6 million and act as the General Partner. As discussed below, the representation that HITT contributed his own funds was material to Investor A, Investor B, and Investor C when deciding to invest.

17. In reality, records show that HITT did not contribute his own capital as HITT had represented to investors. Additionally, HITT raised a total of approximately $10.92 million from investors in KHS, thus overcapitalizing the project. In fact, HITT only needed $8.86 million to close the deal because of credits from the seller.

18. On approximately February 23, 2018, the KHS deal closed.

19. HITT diverted the overcapitalized funds to other projects and expenses without notifying any of the KHS investors.

4

## STATEMENT OF FACTS SUPPORTING PROBABLE CAUSE

20. HITT presented himself and KIDDAR CAPITAL through press releases and a website (www.kiddar.com) as successful investors with a large amount of assets under management. For example, in a February 2017 press release, KIDDAR CAPITAL claimed to have $600 million in assets under management and stated, "We contribute 10% of the total fund from our own capital so we have skin in the game and are right alongside our limited partners." Additionally, in June 2018, the KIDDAR CAPITAL website stated, "Launched by American businessman Todd Hitt, the firm manages $1.4 billion across established and emerging asset classes including private equity, real estate, infrastructure, venture, credit, energy, and hospitality."

21. As this investigation has revealed, HITT and KIDDAR CAPITAL managed nowhere close to the amount of assets they claimed. Additionally, the representation of having "skin in the game" by co-investing in projects was repeated to numerous investors. Records gathered during this investigation and interviews conducted reveal that, this representation as it related to the KHS offering was materially false.

22. In addition, the KIDDAR CAPITAL website referred to the company as a "global asset management firm" with offices in the Washington, DC area, Houston, Palm Springs, and London. In fact, your affiant has learned that KIDDAR CAPITAL's only office was located in Falls Church, Virginia.

23. The FBI interviewed several employees of KIDDAR CAPITAL who were concerned and/or confused by apparently false statements made by HITT to potential investors regarding the company's assets under management, the company's office location(s), the company and/or HITT's own investment in projects, and how investor funds were used.

*Information from Employees of KIDDAR CAPITAL*

*Employee A:*

24. When first hired at KIDDAR CAPITAL, Employee A expected to have access to the company's financials based on the nature of Employee A's position. However, Employee A became increasingly concerned about the lack of transparency with the company's financials, the inability to reconcile investor money in certain offerings, and statements Employee A suspected were false that HITT included in offering materials.

25. Employee A was also concerned that HITT appeared to spend lavishly on cars and meals, but at the same time had liquidity problems. For example, HITT employed a personal driver, but KIDDAR CAPITAL did not always have enough liquidity to fund its payroll.

26. One of the KIDDAR CAPITAL offerings Employee A thought was concerning was KHS. According to Employee A, KIDDAR CAPITAL began soliciting for KHS in approximately July 2017 and accepted the first funds from investors in approximately August 2017.

27. Employee A attempted to reconcile the amount of funds raised for the project versus the amount of money actually invested, but could not get the figures to match. Instead, it appeared to Employee A that more than $10 million was raised from investors and only approximately $8 million was used by HITT for the investment.

28. Additionally, Employee A could not find evidence of HITT contributing the amount of money HITT promised investors that HITT would contribute as the General Partner for KHS.

29. Another "red flag" for Employee A was that approximately $1 million to $2 million was moved from the KHS bank account to a completely unrelated KIDDAR CAPITAL investment fund.

30. After becoming concerned about each of these "red flags," Employee A decided to attempt to validate HITT's representation that KIDDAR CAPITAL managed $1.4 billion in assets. Employee A was only able to come up with approximately $27 million in assets.

*Employee B:*

31. Employee B shared many of the same concerns as Employee A, including that HITT falsely represented to potential investors that KIDDAR CAPITAL managed more than one billion dollars in assets. Employee B also saw presentations used by HITT to solicit investors that showed four or five office locations for KIDDAR CAPITAL, but Employee B believed that the Falls Church, Virginia location was KIDDAR CAPITAL's only office location.

32. Specific to the KHS offering, Employee B believed that more capital than necessary was raised from Limited Partners and HITT had not contributed $6 million, despite HITT representing to investors that he had done so as the General Partner.

33. Employee B had an additional concern regarding KHS involving the debt side of the deal. Employee B believed that HITT was required to maintain a collateral account that held 10% of the amount of the loan with the bank that issued the loan, but this account did not appear to exist.

34. Employee B expected operating statements and a Schedule K-1 would necessarily be prepared for investors in KHS based on the cash flow associated with the existing tenant of the Herndon building. However, Employee B was unaware of any process to do so.

35. Additionally, Employee B was concerned that HITT included a recapitalization of KHS in proposals to new investors. The original investors were told KHS was an approximately six year deal and Employee B believed that recapitalizing the deal would result in the original investors losing a major opportunity to increase their equity. As discussed below, HITT accepted money from Investor C and Investor D even after the KHS deal was closed. However, instead of

actually recapitalizing the deal, HITT simply diverted the additional funds for purposes other than KHS.

*Employee C:*

36. Employee C corroborated much of what Employee A and Employee B had previously told the FBI regarding the KHS offering. Specifically, Employee C observed more than $10 million deposited into the KHS bank account, but only between $8 million and $9 million was used for the purchase of the Herndon building. As of the date of the interview, there was no money left in the KHS bank account, so Employee C believed the money was spent in a manner inconsistent with the representations made by HITT to investors.

37. Although Employee C could not recall specific personal expenses taken by HITT out of the KHS bank account, Employee C was sure that it had happened. HITT frequently moved money between accounts to cover expenses.

*HITT's Representations to Investors*[1]

*Investor A:*

38. HITT first solicited Investor A on the KHS offering in approximately July 2017. Investor A was an established real estate professional with experience in deals similar to the KHS offering.

39. It was Investor A's understanding based on communications from HITT, including an offering memorandum and other documents, that $12 million in equity would be used along with debt from a bank in order to execute the $33 million purchase of the Herndon building.

---

[1] During this investigation, your affiant has learned that each of the investors referenced in this affidavit (A, B, C, and D) believed that they were investing money in a common enterprise and were led to expect profits solely from the efforts of the promoter, in this case, Todd Hitt and Kiddar Capital. Accordingly, it is my belief that these investments amounted to "securities" as that term is referenced in Title 15 United States Code, Sections 78j(b) and 78ff.

Further, HITT represented to Investor A that outside investors would put up $6 million and HITT would contribute the other $6 million in equity.

40. Investor A considered HITT to be the "sponsor" of the KHS investment. It was important to Investor A that the "sponsor" of any investment have "skin in the game." Investor A explained further that if a "sponsor" did not have "skin in the game," they were more likely to take chances. It was important to Investor A that the interests of the "sponsor" aligned with his/her own. For these reasons, it mattered to Investor A when deciding to invest in KHS that HITT would be contributing 50% of the equity.

41. Investor A provided the FBI with several documents and emails from HITT that included representations from HITT stating that HITT would contribute half the equity in KHS. For example, on November 7, 2017, HITT emailed Investor A from the email address thitt@kiddar.com with a subject line of "Herndon Station." In the email, HITT listed each Limited Partner investor and the amount of their equity contribution. Underneath the investor list, HITT wrote, "Hitt Equity $6m." The email continued with a discussion of a potential investor who HITT believed may contribute the remaining amount needed to close. HITT concluded the email apparently telling Investor A that if the final investor did not come through, "... then I will make up the difference." HITT utilized a signature in this email and others with the title CEO of KIDDAR CAPITAL.

42. Investor A invested $500,000 in KHS based on the representations from HITT.

*Investor B:*

43. Investor B was a friend of HITT and was solicited by HITT on a variety of investments since approximately 2011. Investor B was not an experienced real estate professional and relied on HITT's expertise in this area when deciding to invest. On numerous occasions, Investor B decided to fund certain investments after HITT told him that he was also investing in the

venture. On many of these occasions, including the KHS offering, HITT lied to Investor B about being a co-investor.

44. In approximately August 2017, HITT solicited Investor B on the KHS offering through in person meetings, an offering memorandum, and email communications. HITT explained the deal to be the purchase of the Herndon building for approximately $33 million through equity contributions from investors and a bank loan.

45. Specifically, HITT represented he would contribute $6 million as the General Partner and that a total of another $6 million would be required from Investor B in combination with contributions from two other investors. On August 8, 2017, HITT sent Investor B an email stating, "Right now, I'm putting in $6m, and we have 3 other investors (including you) putting in $6m. You take whatever part of that you want and I'll have the others pick up whatever you leave for them. I want fewer rather than more investors."

46. It was important to Investor B that HITT contributed the $6 million to the project because it meant that HITT would have "skin in the game."

47. In meetings and other communications, HITT identified the two other investors as Investor A and HITT's brother, who are both well-known and successful individuals within the construction industry. It was material to Investor B when deciding to invest that the other investors were HITT, his brother, and Investor A, because Investor B believed that each of them were sophisticated real estate investors.

48. Additionally, it was material to Investor B that there were a small number of investors in the KHS offering. This was important to Investor B because he believed HITT was in control of the project. If Investor B thought there was a larger number of investors, he would not have invested. A larger number of investors would have meant that HITT had less control and the profits would have been diluted.

49. In reality, HITT's representations regarding his own investment, his brother's investment, and the number of investors were all false. As discussed below, HITT did not contribute his or KIDDAR CAPITAL's funds to the KHS offering. Based on information from Employee A and the financial analysis discussed below, HITT's brother was not an investor in the KHS offering and the total number of investors was approximately 29.

50. Based on the false representations by HITT, Investor B invested a total of $1,750,000 in approximately three transactions beginning in August 2017.

*Investor C:*

51. In late March or early April 2018, representatives of Investor C were sent an offering memorandum, dated March 2018, for KHS. A broker introduced Investor C to HITT and a representative of Investor C met HITT in person near the Herndon building to discuss the KHS offering.

52. Investor C understood that the Herndon building was already owned by KHS and that Investor C would be contributing equity in order to either buy out an outside investor or buy out a portion of the Limited Partnership that HITT fronted because he did not raise enough money from outside investors.

53. Regardless, HITT represented to Investor C that HITT contributed the General Partner's $6 million portion of the original investment. Investor C was pleased that the General Partner invested this amount into the transaction. According to representatives of Investor C, they would have "dug way deeper" if they had learned that HITT had not invested the $6 million into the transaction as HITT had represented. Investor C would never agree to a deal if the General Partner did not have "skin in the game."

54. In May 2018, Investor C wired their $1.2 million investment to the KHS bank account. As discussed further below, these funds were diverted to purposes other than the KHS offering.

*Investor D:*

55. Investor D was another investor involved in a post-closing deal related to the KHS offering.

56. Between approximately June 2018 and August 2018, Investor D wired approximately $6 million and executed an agreement with HITT to become a Class A member of KIDDAR CAPITAL. Prior to this, Investor D reviewed the KIDDAR CAPITAL website that contained the numerous misrepresentations identified above.[2]

57. Although Investor D signed an agreement to invest in KIDDAR CAPITAL, it was Investor D's understanding and expectation based on representations from HITT that Investor D's $6 million investment would be used to invest in KHS.

58. As discussed below, a significant portion of Investor D's money was used for HITT's personal expenses and to pay Investor A in a separate investment.

*Financial Analysis by the SEC*

59. The SEC obtained bank records for accounts belonging to HITT, KIDDAR CAPITAL, KHS, and related entities. The records corroborated the allegations from Employee A, Employee B, and Employee C, regarding HITT's misrepresentation of his own investment in KHS, the overcapitalization of KHS, and the misappropriation of funds from the KHS account.

---

[2] Based on my training and experience, your affiant understands that operating internet websites, wiring funds, and sending emails are all actions, among many others, that affect interstate commerce.

60. Specifically, the SEC's analysis of bank records found:

   a. HITT and KIDDAR CAPITAL did not contribute $6 million in connection with being General Partner of the KHS investment.

   b. Between approximately August 9, 2017 and March 8, 2018, a total of $9.72 million in equity was contributed to KHS's bank account from outside investors. Of these contributions, approximately $8.86 million was used to close on the purchase of the Herndon building. The remaining investor contributions were misappropriated, including diversions to unrelated business projects and payments for credit card bills.

   c. On or about May 18, 2018, Investor C wire transferred $1.2 million to a KIDDAR CAPITAL bank account. Over the next several weeks, HITT transferred a net of approximately $400,000 to two of his personal bank accounts and an additional $600,000 to a business account. Within days of transferring the $600,000 to the business account, approximately $230,000 out of these funds was used to pay off a credit card bill that included the following charges:

   | | |
   |---|---|
   | "NBA – Washington Wizards" | $7,791 |
   | "USA Livery Inc." | $7,065 |
   | "Canyon Ranch Resort" | $26,910 |
   | "Bulgari" | $59,220 |
   | "Cartier" | $5,241 |
   | "Denise Betesh" | $6,840 |
   | "Chantilly Air" | $52,997 |
   | "Ultimate Jet Vacations" | $33,110 |

   d. Between approximately June 26, 2018 and August 3, 2018, Investor D wired approximately $6 million to KIDDAR CAPITAL bank accounts. Approximately $1.4 million of this money was transferred to HITT's personal bank accounts. HITT then used a portion of the $1.4 million to (1) pay Investor A $312,000 for the return

13

of an investment unrelated to KHS, (2) transfer $125,000 to an unrelated real estate venture, and (3) pay $222,258.23 to his American Express card balance, which included, in part, the following charges:

| | | |
|---|---|---|
| 5/24/18 | "NHL-Washington Capitals" | $3,240 |
| 5/24/18 | "NBA-Washington Wizards" | $8,250 |
| 5/24/18 | "NBA-Washington Wizards: | $59,500 |
| 5/28/18 | "Mercedes-Benz" | $10,000 |
| 6/02/18 | "Four Seasons Bourbon" | $2,897.40 |
| 6/7/18 | "Four Seasons Baltimore" | $3,083.63 |
| 6/10/18 | "The Inn at Perry Cabin" | $11,462.24 |
| 6/11/18 | "NHL-Washington Capitals" | $2,704 |
| 6/15/18 | "NBA-Washington Wizards" | $25,500 |
| 6/15/18 | "NHL-Washington Capitals" | $4,166 |
| 6/15/18 | "BB*PHILLIPS COLLECTION Blackbaud, Inc." | $35,370 |

## CONCLUSION

61. Based on my training and experience, and the information provided in this affidavit, there is probable cause to believe that from in or around July 2017 to in or about September 2018, within the Eastern District of Virginia and elsewhere, TODD ELLIOTT HITT raised millions of investor funds through false statements, material misrepresentations and material omissions in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17 Code of Federal Regulation, Section 240.10b-5 (Securities Fraud).

Jeremy Desor
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on October 4, 2018

/s/
John F. Anderson
United States Magistrate Judge
JOHN F. ANDERSON
UNITED STATES MAGISTRATE JUDGE