## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | CRIMINAL NO. 1:19-CR-43 |
| TODD ELLIOTT HITT, | ) | |
| | ) | |
| Defendant. | ) | |

### United States' Response in Opposition to
### Defendant's Motion for Compassionate Release

Over the span of four years, Todd Elliott Hitt (the "Defendant") operated a Ponzi scheme that resulted in the loss of about $20 million and victimized about 40 investors.  After accepting the Defendant's guilty plea, this Court sentenced the Defendant to 78 months in prison upon the parties' joint recommendation on June 21, 2019.  And yet, after a year and a half, the Defendant now seeks early termination of his prison term under the compassionate release provision in 18 U.S.C. § 3582(c)(1)(A)(i).  In particular, the Defendant contends ███████████, the presence of COVID-19 in his facility, and the nature of his crimes constitute "extraordinary and compelling reasons" to warrant early compassionate release.

The Court should deny the Defendant's motion.  The Defendant does not meet his burden of establishing that he is at a sufficiently heightened risk of contracting COVID-19.  The Defendant also fails to show that his prison facility is at a sufficiently heightened risk of a coronavirus outbreak.  The health and safety of the Defendant aside, the Court should also deny his motion in light of the 18 U.S.C. § 3553(a) factors.  The Defendant's fraud inflicted regional economic damage and was multimillion in scale.  He remains an economic danger to the public, given his current debilitated financial state and the sophisticated methods he previously used to defraud his victims.  Finally, releasing such a high-profile defendant after less than a quarter of

his sentence has been served would undermine the need to promote respect for the law and deter criminal conduct.  For all of these reasons, and for the reasons below, the Court should deny the Defendant's motion.

### Background

Between 2014 and 2018, the Defendant engaged in a scheme to defraud investors that resulted in about $20 million in losses.  ECF No. 26 1-2.  The Defendant solicited approximately $30 million from investors throughout his scheme.  *Id*.  Over 40 victim investors were affected. ECF No. 56 at 10.

The Defendant diverted millions of dollars across various investment projects in an elaborate Ponzi scheme.  On one occasion, the Defendant advertised that his firm managed $1.4 billion in assets when its assets totaled no more than $27 million.  ECF No. 26 ¶ 6.  On another occasion, the Defendant falsified purchase documents and forged sellers' signatures in order to mislead two investors into believing he purchased investment property, thereby fraudulently convincing the victims to invest $1.2 million.  ECF No. 56 at 6.  And on other occasion, he raised about $1 million by creating a fake email account purporting to be a particular investor and fabricating emails from that account without the investor's knowledge or consent.  *Id*. at 4. These are only a few of the samples of the fraudulent tactics the Defendant employed throughout his schemes.

This prosecution began with the filing of a criminal complaint in October 2018. Presentence Investigation Report ("PSR") ¶ 1.  A criminal information was filed on February 13, 2019, charging the Defendant with Securities Fraud, in violation of 15 U.S.C. §78j(b) and §78ff; 17 Code of Federal Regulations, §240.10b-5; and 18 U.S.C. §2.  *Id*. at ¶ 3.  On the same day, the Defendant pled guilty to the single count before this Court.  *Id*. at ¶ 4.

On June 21, 2019, he was sentenced to a total of 78 months of imprisonment and 3 years of supervised release.  ECF No. 64.  Despite the fact that the applicable Sentencing Guidelines range after the acceptance of responsibility reduction was 97 to 121 months' of incarceration, the United States agreed with the Defendant to jointly recommend 78 months.  ECF No. 56 at 1 and 10.  Notably, this Court found that the applicable Guidelines range was 97 to 127, but imposed a sentence consistent with the joint recommendation of the parties.  ECF No. 63.  The United States' agreement to the recommendation was contingent upon the Defendant's payment, or that by those acting for his benefit, of $20 million in restitution in order to make the victims whole.  ECF No. 24 at 4.  However, a shortfall of $2,392,520 remains.  ECF No. 100.

On May 18, 2020, less than one year after being sentenced, the Defendant submitted to the Federal Bureau of Prisons ("BOP") a request for compassionate release, which was denied on June 9, 2020.[1]  ECF No. 95.  On December 18, 2020, about 17 months after he was committed to the custody of the BOP for 78 months, the Defendant filed a motion under 18 U.S.C. § 3582(c)(1)(A)(i) seeking to have his sentence terminated.  *Id*.

## Argument

**I.    The Defendant's request for compassionate release should be denied due to a number of practical and legal considerations.**

The BOP is actively working to contain the spread of the coronavirus within prisons. BOP has, among other steps, limited access to prisons, restricted prisoner movements within prisons, used screening and testing, sought to educate inmates and staff on preventing the spread

---

[1] Under 18 U.S.C. § 3582(c)(1)(A), a defendant cannot obtain relief from this Court until BOP is given 30 days to evaluate the defendant's motion for compassionate release based on the threat of COVID-19, or unless he exhausts his administrative remedies for challenging BOP's denial of such a request—whichever occurs first. Here, it appears that the Defendant exhausted his administrative remedies by submitting to BOP a request for compassionate release on May 18, 2020, which was denied on June 9, 2020.

of disease, provided masks and hand cleaners, separated ill inmates, and—in appropriate cases—released inmates for home confinement under 18 U.S.C. § 3624(c)(2), as amended by § 12003(b)(2) of the CARES Act.[2]

Before the CARES Act was passed, § 3624(c)(2) provided BOP with the exclusive authority to "place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months." This provision is in keeping with BOP's authority to designate where an inmate serves a sentence. Congress has now, temporarily, expanded § 3624(c)(2), while leaving its application to BOP. As part of the CARES Act, Congress sought to address the spread of the coronavirus in prison by permitting BOP to expand the use home confinement under § 3624(c)(2). Section 12003(b)(2) of the Act suspends, during the coronavirus emergency, the limitation in § 3624(c)(2) that restricts home confinement to the shorter of 10 percent of the inmate's sentence or 6 months, once the Attorney General makes requisite finding that emergency conditions will materially affect the function of BOP.[3] The Attorney General made those findings on April 3, 2020, conferring on BOP the authority to expand its use of home confinement.

Since March 26, 2020, BOP has placed 19,592 inmates on home confinement (*see* https://www.bop.gov/coronavirus/index.jsp), focusing on, among other factors, the vulnerability of particular inmates, the prisons most at risk, and the dangers posed by inmates if released.

---

[2] *See* Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (2020) ("CARES Act").

[3] Section 12003(b)(2) provides that "if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau, the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate."

4

Inmates do not have to apply to be considered for home confinement.

In weighing the appropriateness of home confinement, BOP considers, among other factors, whether a home is available where the inmate could be confined, whether the inmate could receive appropriate food and medical care there, the comparative risk to the inmate in home confinement in the identified location versus remaining in prison, the inmate's risk to the public through recidivism, and the availability of supervision during home confinement or risk to the public if supervision is lacking.  BOP also seeks to ensure that the inmates it releases to home confinement are not already ill and therefore spreading infection to others—including spreading illness to the individuals who would be needed to make home confinement successful.  To help accomplish that goal, BOP is requiring a 14-day quarantine period before any inmate is released to home confinement.

In addition to these efforts to increase the use of home confinement, BOP is continuing to accept and review requests for compassionate release under 18 U.S.C. § 3582(c)(1)(A).

A current modified operations plan requires that all inmates in BOP institutions be secured in their assigned cells/quarters for a period of at least 14 days to stop any spread of the disease.  Only limited group gatherings are permitted, with social distancing required to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access.  Further, BOP has severely limited the movement of inmates and detainees among its facilities.  Though there will be exceptions for medical treatment and similar exigencies, this step also limits transmission.

All staff and inmates have been and will continue to be issued an appropriate face covering and strongly encouraged to wear the face covering when in public areas when social distancing cannot be achieved.  Every newly admitted inmate is screened for COVID-19 risk

factors and symptoms.  Asymptomatic inmates with risk of exposure are placed in quarantine.

Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are

cleared by medical staff as meeting CDC criteria for release from isolation.  In addition, in

areas with sustained community transmission and at medical centers, all staff are screened for

symptoms.  Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred

from the facility on that basis alone.  A staff member with a stuffy or runny nose can be

placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential

services (*e.g.*, medical or mental health care, religious, etc.) or those who perform necessary

maintenance on essential systems.  All volunteer visits are suspended absent authorization by

the Deputy Director of BOP.  Any contractor or volunteer who requires access will be

screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, 2020, and presently remain

suspended to limit the number of people entering the facility and interacting with inmates.  To

ensure that familial relationships are maintained throughout this disruption, BOP has

increased detainees' telephone allowance to 500 minutes per month.  Tours of facilities are

also suspended.  Legal visits will be permitted on a case-by-case basis after the attorney has

been screened for infection in accordance with the screening protocols in place for prison

staff, contractors, and visitors.

Further details and updates of BOP's modified operations are available to the public on

the BOP website at a regularly updated resource page:  www.bop.gov/coronavirus/index.jsp.

Rather than relying on BOP to address what both Congress and the Attorney General

have determined is a time-sensitive, rapidly evolving emergency—and after Congress placed a

specifically targeted tool in the hands of BOP via § 12003(b)(2) of the CARES Act—the Defendant envisions a system where hundreds of federal district judges around the country try to use the tools of litigation to replicate, and potentially override, BOP's efforts.  And critically, under the Defendant's approach, courts must attempt to assess facts that can change within days—if not hours—when many of the changing circumstances could nullify the intended goal of any court order.

In any event, the Court's adjudication of the Defendant's motion necessarily touches on many of the following fact-specific issues:

- *Safety of place of home detention.*  An inmate's proposed residence after release from prison should be a place where no person is infected or soon to be infected.

- *Avoiding recidivism.*  The conditions and place where a defendant will stay after release must limit the risk of recidivism—an important consideration given that federal inmates have a re-arrest rate that ranges from 30.2% for inmates with no criminal history points to 85.7% for inmates with 15 or more criminal history points.[4]  New arrests not only endanger the public and return an inmate to prison, but also increase the dangers to arresting officers and supervising probation officers.

- *Protecting the public from infection.*  Any release should include measures to assure that an inmate who is presently incarcerated is not infected by the time that the Court ordered any release, undermining the benefits of the release;

- *Evaluating how much of a difference a defendant's proposal would make to disease transmission inside defendant's prison.*  Before a defendant receives the benefit of being released from prison, a court should determine the extent to which releasing a particular inmate makes a difference to disease transmission in one of the 30 BOP facilities and 6 residential reentry centers that BOP is monitoring for coronavirus infections, *See* https://www.bop.gov/coronavirus/;

- *Assessing how much release would affect the particular inmate's health.*  To justify cutting short an inmate's sentence, a defendant's release should

---

[4] *See* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf#page=12.

make a sufficiently great improvement to the odds of maintaining an inmate's health.

This list is not exhaustive and, indeed, could include many additional considerations. The key point is that, in light of the BOP's efforts to control the spread of COVID-19, the Court should exercise its discretion in such a way as to grant compassionate release only where the defendant's medical situation, the presence of coronavirus at his facility of confinement, and the statutory sentencing factors support doing so. For the reasons that follow, this is not such a case.

## II.    The Defendant has not established a sufficient basis for compassionate release.

The Defendant bears the burden to demonstrate that he is entitled to compassionate release under § 3582(c)(1)(A)(i). *See White v. United States*, 378 F. Supp. 3d 784, 785 (W.D. Mo. 2019); *see also generally Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56–57 (2005) ("Absent some reason to believe that Congress intended otherwise … the burden of persuasion lies … upon the party seeking relief."). Compassionate release is not appropriate in this case because the Defendant has not established "extraordinary and compelling reasons" for such relief under § 3582(C)(1)(A)(i).

Courts have generally agreed that the existence of the pandemic, standing alone, is not a sufficient basis for granting compassionate release. As the U.S. Court of Appeals for the Third Circuit put it, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). Instead, courts in this district have found "extraordinary and compelling reasons for compassionate release [on the basis of COVID-19] when an inmate shows both a particularized susceptibility to the disease and a particularized risk of contracting the disease at his prison facility." *United States v. White*, — F.

Supp. 3d —, 2020 WL 1906845, at *1 (E.D. Va. Apr. 17, 2020) (quoting *United States v.*

*Feiling,* 453 F. Supp. 3d 832, 842 (E.D. Va. 2020)).[5]

      The Defendant has neither demonstrated a particularized susceptibility to COVID-19 due

to a health condition that justifies release, nor has he shown that he faces a particularized risk of

contracting COVID-19 in his particular unit within the BOP facility.  Moreover, the Defendant

does not establish that his proposed release plan would provide him with more protection or

better medical treatment in the event of COVID-19 contraction than his current BOP facility.

> **A.    The Defendant has not shown that he in particular is at a heightened risk of a contracting COVID-19.**

      The Defendant failed to meet his burden of showing that his health conditions constitute

"extraordinary and compelling reasons" to warrant early compassionate release pursuant to §

3582(c)(1)(A)(i).  "BOP's guidance, read in conjunction with the Application Notes to § 1B1.13,

indicate that a defendant's medical condition must be one of substantial severity and

irremediability . . . ." *United States v. Lisi*, No. 15-CR-457, 2020 WL 881994, at *4 (S.D.N.Y.

Feb. 24, 2020), *reconsideration denied*, 2020 WL 1331955 (S.D.N.Y. Mar. 23, 2020).

> Section 1B1.13 provides that a defendant can establish an extraordinary and compelling reason if he is "suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he . . . is not expected to recover."

*Lisi*, 2020 WL 881994, at *4 (quoting U.S.S.G. § 1B1.13, cmt. n.1(A)(ii)).  "Chronic conditions

that can be managed in prison are not a sufficient basis for compassionate release." *United*

*States v. Ayon-Nunez*, No. 1:16-CR-130, 2020 WL 704785, at *2–3 (E.D. Cal. Feb. 12, 2020)

---

[5] *See also United States v. Little*, No. 1:10-CR-135 (CMH), 2020 WL 3442173, at *2 (E.D. Va. June 23, 2020) (adopting the criteria from *Feiling*); *United States v. White*, No. 3:18-CR-61 (HEH), 2020 WL 3442171, at *5 (E.D. Va. June 23, 2020) ("Defendant's request for release on home confinement is based upon nothing more than 'the mere possibility that COVID-19 will spread to his facility'-a fear that is insufficient to justify release." (citing *Feiling*)).

(internal quotation marks omitted) (denying motion for release where "defendant merely claims in conclusory fashion that he suffers from a number of medical conditions, including severe back injuries and epilepsy, that are not being adequately treated at his institution of confinement").

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████

    First, the CDC has identified several categories of people at higher risk of severe illness from COVID-19, including people who suffer from certain health conditions.  "People Who Are at Higher Risk of Severe Illness," CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited December 29, 2020).  ██████████████████

███████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

10



. *Lisi*, 2020 WL 881994, at \*4 (emphasis added).  In other words, even if the Defendant establishes health conditions of substantial severity and his susceptibility to severe illness in the event of contracting COVID-19, he fails to establish the inadequacy of the medical care he has been receiving at FCI Cumberland or "that

the facility would not be equipped to treat him if he became ill." *Stacharczyk*, 2020 WL
7391135, at *2. █████████████████████████████████████

████████████████████████████████████████████████████

**B.      The Defendant has not shown that his prison facility is at heightened risk of a
          coronavirus outbreak.**

The Defendant also fails to assert that his prison facility is at heightened risk of a
coronavirus outbreak.  He currently is incarcerated at FCI Cumberland.  According to statistics
available from the BOP, as of December 30, 2020, FCI Cumberland has 3 inmates testing
positive for COVID-19; 246 inmates previously testing positive who have since recovered; and 0
inmate deaths.  Those numbers are relative to a total inmate population of 1,063.

All inmates who have tested positive are being appropriately treated or isolated according
to CDC guidelines adopted by the BOP.  The facility continues to adhere to the BOP modified
operations plan described above, and has, among other steps, restricted prisoner movements
within the facility, used screening and testing, sought to educate inmates and staff on preventing
the spread of disease, and provided masks and hand cleaners.  These measures have been proving
successful: while the Defendant attempts to paint a dire image of an outbreak at FCI Cumberland
by stating that 64 of its inmates tested positive on December 17, 2020, current statistics indicate
a dramatic reduction of these figures.

For all of these reasons, the Defendant has not shown, in any particularized fashion, that
he is entitled to additional relief based on the risk of contracting COVID-19.  *Cf. United States v.
Campos-Ramenthol*, 805 F. App'x 328, 330 (5th Cir. 2020) (defendant not entitled to pretrial
release due to COVID-19 where "[t]here were no reported cases of COVID-19 at the jail" where
he was housed and "the jail has procedures in place in case of an outbreak, including the
isolation of high-risk inmates").

C.      **The Fourth Circuit's decision in *United States v. McCoy* does not entitle the Defendant to relief.**

In *United States v. McCoy*, 981 F.3d 271 (4th Cir. Dec. 2, 2020), the Fourth Circuit held

that the policy statement found in U.S.S.G. § 1B1.13 does not apply to compassionate release

motions brought by inmates under 18 U.S.C. § 3582(c)(1)(A)(i).  *Id*. at 280-85.  According to

*McCoy*, because § 1B1.13 specifics its applicability only to motions brought by the Bureau of

Prisons, it cannot be the policy statement applicable in circumstances where defendants bring

their own motions for compassionate release.  *Id*.  In place of the no-longer-applicable policy

statement, *McCoy* permits "courts [to] make their own independent determinations of what

constitutes an 'extraordinary and compelling reason[ ]' under § 3582(c)(1)(A), as consistent with

the statutory language[.]"  *Id*. at 284.

*McCoy* noted, however, that § 1B1.13 "remains helpful guidance even when motions are

filed by defendants."  *Id*. at 282 n.7.  In stating as such, *McCoy* approvingly cited the Seventh

Circuit's recent decision in *United States v. Gunn*, 980 F.3d 1178 (7th Cir. Nov. 20, 2020),

which similarly held that there currently exists no applicable policy statement for compassionate

release motions brought by inmates.  Nonetheless, the Seventh Circuit explained that § 1B1.13

remains useful in framing a court's inquiry as to what constitutes "extraordinary and compelling

reasons."  As it stated, "[t]he statute itself sets the standard: only 'extraordinary and compelling

reasons' justify the release of a prisoner who is outside the scope of § 3582(c)(1)(A)(ii).  The

substantive aspects of the Sentencing Commission's analysis in § 1B1.13 and its Application

Notes provide a working definition of 'extraordinary and compelling reasons'; a judge who

strikes off on a different path risks an appellate holding that judicial discretion has been abused.

In this way the Commission's analysis can guide discretion without being conclusive."  *Id*. at

1180 (citing *Gall v. United States*, 552 U.S. 38, 49–50 (2007); *Kimbrough v. United States*, 552

U.S. 85 (2007)). Thus, although *McCoy* broadened district courts' discretion under § 3582(c)(1)(A), it nonetheless appeared to envision a system whereby courts remain confined within a traditional discretionary framework.

In its broadest terms, *McCoy* thus holds that although § 1B1.13 is no longer the applicable policy statement for compassionate release motions brought by inmates, defendants still must meet the "heightened standard" required by § 3582(c)(1)(A)(i). Both before and after *McCoy*, defendants must clear the "extraordinary and compelling" threshold set forth in the statute. As *McCoy* put it, such relief will be granted in "truly exceptional cases[.]" *Id*. at 287. In other words, the defendant must present circumstances that are "[b]eyond what is usual, customary, regular, or common," Extraordinary, *Black's Law Dictionary* (11th ed. 2019), or "go[] beyond what is usual, regular, or customary," or that are "exceptional to a very marked extent." "Extraordinary." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/extraordinary. Accessed 3 Dec. 2020. *McCoy* does nothing to displace that "heightened standard."

In *McCoy*, the Fourth Circuit stated that a district court must make an individualized inquiry in each case, and noted that the district courts at issue relied upon individual circumstances of the appellees, including "the [appellees'] relative youth – from 19 to 24 years old – at the time of their offense . . . combined with the substantial sentences the defendants already had served" and noted that each appellee had established "excellent institutional records and taken substantial steps toward rehabilitation." 981 F.3d at 288.

In affirming the grant of compassionate release for the four appellees, the Fourth Circuit highlighted that each of the four were relatively young at the time of offense, and each had either no criminal history, a minor criminal history that lacked any prior incarceration, or no relevant

criminal history.  The Fourth Circuit noted in its discussion of *United States v. McCoy*, that the district court "relied on the fact that McCoy was a teenager with no relevant criminal history at the time of his offenses." *Id*. at 278.  In discussing *United States v. Bryant*, the Fourth Circuit noted that the district court considered that the three appellees' (Keith Bryan, Kittrell Decator and Craig Scott) crimes did not result in any injuries, and noted "the defendants were between 22 and 24 years old" and "Decator and Scott had no criminal history, and Bryant had one minor prior conviction for which he served no jail time." *Id.*

Here, the Defendant fails to meet the heightened standard required by § 3582(c)(1)(A)(i), and the Defendant's specific factors including his age at the time of his crime and the underlying facts of his crime do not support granting his request for compassionate release.  In this case, the Defendant was not a young man at the time of his offenses like the four appellees at issue in *McCoy*.  Rather, the Defendant committed the underlying offenses between ages 50 and 54.  PSR at 3.  And his crimes generally involved complex methods and calculations to defraud, as discussed below.

> **D.     In the exercise of its discretion, the Court should deny compassionate release in light of the statutory sentencing factors.**

Compassionate release is appropriate only where the "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2).  That statute instructs the Court to consider several factors, including whether the underlying offenses constitute crimes of violence or involved firearms.  At the same time, § 3582(c)(1)(A) expressly directs the Court to consider the statutory sentencing factors under 18 U.S.C. § 3553(a) in adjudicating a compassionate release motion.  Here, these factors counsel strongly against granting a reduction in the Defendant's sentence.

1.    <u>Seriousness of the Offense</u>

The Defendant's criminal scheme spanned about four years, inflicted harm on 40 victim investors, and resulted in about $20 million in losses.  His scheme did not result from rash youthful judgment; rather, it was a sophisticated, multiyear operation involving deceit, coverups, and abuse of trust.  Nor did it result from economic despondence; the Defendant was already a prominent, affluent real estate developer who funneled some of the scheme's proceeds towards personal credit card bills listing charges from companies such as Bulgari, Cartier, and Ultimate Jet Vacations.  ECF No. 26 at 5.  In a post-Madoff world, an actor as sophisticated as the Defendant must have known of the illegality of running such a Ponzi scheme.  And yet, the Defendant apparently determined that the legal risks were worth it.

2.    <u>Danger to the Public</u>

The Defendant's release would pose a danger to the public.  Between funneling funds, posing as another investor and sending unauthorized emails under his name, and fabricating purchase documents, the Defendant employed tactics to deceive his victims with limitless creativity and sophistication.  Given the technology available today, the Defendant would be in a position to continue to defraud without ever having to leave his home.

Upon release, the Defendant would be even worse off than he was when committing the offenses; he is unemployed, is indebted for thousands of dollars, and has no assets because they were liquidated for restitution.  PSR ¶ 108-10.  Thus, he is even more incentivized to once again resort to fraud.  Therefore, the Defendant would be an economic danger to the public, which is already vulnerable given the economic fallout from the COVID-19 pandemic.  *See, e.g.*, *United States v. Edington*, 2020 WL 2744140, at *5 (D. Colo. May 27, 2020) (denying motion for compassionate release in part because the defendant posed an economic danger to the public,

since she was convicted of stealing and altering checks from victims' mailboxes).

       3.    Deterrence

Releasing the Defendant when less than a quarter of his sentence was served would undermine the need to promote respect for the law and deter criminal conduct. Given the Defendant's prominence and the size of his criminal scheme, his matter received extensive media coverage throughout the proceedings.[6] His release would likely trigger media coverage as well. In such a scenario, the public would receive the message that in the Eastern District of Virginia, one can unscrupulously solicit $30 million and face only 17 months' imprisonment. Given the difficulty of government detection of white-collar crimes, several spectators might rationalize that the risk of suffering less than 1.5 years of loss of freedom might be a reasonable cost to bear if it means gaining millions.

Finally, the Defendant has served a percentage of his sentence that is lower than what many other courts have deemed insufficient. *See, e.g., United States v. Bogdanoff*, 459 F. Supp. 3d 653, 659 (E.D. Pa. 2020) (denying compassionate release where the inmate had served only seven years of an 18-year sentence, and noting that the case was "much different than others where defendants [sought compassionate release] at the end of their sentence"); *United States v. Moskop*, No. 11-CR-30077 (SMY), 2020 WL 1862636, at *1–2 (S.D. Ill. Apr. 14, 2020) (denying compassionate release where the inmate had served less than 10 years of a 20-year sentence and explaining that the "sentencing objectives of specific deterrence and protecting the

---

[6] *See, e.g.*, Rachel Weiner, *Falls Church CEO Accused of Multimillion-Dollar Real Estate Fraud*, THE WASHINGTON POST (Oct. 5, 2018, 3:20 PM), https://www.washingtonpost.com/local/public-safety/falls-church-ceo-accused-of-multimillion-dollar-real-estate-fraud/2018/10/05/389768d4-c8a9-11e8-9b1c-a90f1daae309_story.html; Andy Medici, *Todd Hitt Sentenced to Prison*, WASHINGTON BUSINESS JOURNAL (June 21, 2019, 3:38 PM), https://www.bizjournals.com/washington/news/2019/06/21/todd-hitt-sentenced-to-prison-term.html.

public [would] not [be] fully served by less than 10 years of incarceration").  Here, the defendant

has only served 17 months of a 78-month sentence (approximately 22% of his sentence).

*        *        *

If this Court were to disagree with the United States' position, however, any order

granting the Defendant compassionate release should require him to undergo a 14-day quarantine

that BOP controls before release.

**Conclusion**

For the foregoing reasons, the Court should deny the Defendant's motion for

compassionate release.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney


/s/
George Meggali
Special Assistant United States Attorney
Tony R. Roberts
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Office:   (703) 299-3804
Fax:       (703) 299-3980
Email:   George.Meggali2@usdoj.gov

**Certificate of Service**

I certify that on December 31, 2020, I filed electronically the foregoing with the Clerk of

Court using the CM/ECF system, which will serve all counsel of record.


By:    /s/ _____

George Meggali
Special Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Office:   (703) 299-3804
Fax:      (703) 299-3980
Email:    George.Meggali2@usdoj.gov

19